IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **BRYAN REDMON, on behalf of himself and others similarly situated,**<br><br>**Plaintiff,**<br><br>**V.**<br><br>**GLOBAL DISTRIBUTION SERVICES, INC. d/b/a AMERICA'S ALLIANCE d/b/a AMERICA'S CHOICE GARAGE DOOR SERVICE, and INDEPENDENT CONTRACTORS GROUP, LLC**<br><br>**Defendants.** | **CIVIL ACTION NO. 4:17-cv-01102**<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COLLECTIVE ACTION COMPLAINT

Plaintiff Bryan Redmon ("Plaintiff"), on behalf of himself and others similarly situated, files this Original Collective Action Complaint against Global Distribution Services, Inc. d/b/a America's Alliance d/b/a America's Choice Garage Door Service, and Independent Contractors Group, LLC (collectively "Global" or "Defendants"), showing as follows:

### SUMMARY

1. Global is in the business of residential and commercial garage door repair, replacement, and service. Global is located in many states and cities across the United States (Dallas Morning News Article of 10/2015, Ex. 1). Global uses many different names to conduct business under, including Independent Contractors Group, LLC (*Id*.). Global has a very sketchy past (*Id*.).

2. Global employs "Technicians" to repair, replace, and service the garage doors. The Technicians regularly work far more than 40 hours in a work week. However, Global classifies

all the Technicians as "independent contractors," and thus does not pay them overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. Global's classification of the Technicians is wrong; they are employees under the FLSA, not independent contractors. Accordingly, Global owes the Technicians overtime pay, liquidated damages and all other remedies available under the FLSA.

## THE PARTIES & JURISDICTION

3. Plaintiff Bryan Redmon is an individual residing in Harris County, Texas. He was employed by Defendants as a Technician. Redmon has standing to file this lawsuit. His notice of consent is attached as Exhibit 2.

4. The "Class Members" are "all current and former Technicians classified as independent contractors who performed work for Defendants at any time during the three-year period preceding the date the Court certifies this case as a Section 216(b) collective action to the present." Like the named Plaintiff, these persons were and are engaged in interstate commerce in performing their duties for Defendants. All of the "Class Members" are similarly situated to Plaintiff and to one another, within the meaning of section 216(b) of the FLSA.

5. Defendant Global Distribution Services, Inc. is a Nevada corporation doing business in Texas for profit. Defendant Global Distribution Services, Inc. may be served with process through its registered agent: Willard Lance at 18484 Preston Road #176, Dallas, Texas 75252. Defendant Global Distribution Services, Inc. uses many different names to do business under, including but not limited to: America's Alliance, and America's Choice Garage Door Service (Dallas Morning News Article of 10/2015, Ex. 1).

6. Defendant Independent Contractors Group, LLC is a Delaware limited liability company doing business in Texas for profit. Defendant Independent Contractors Group, LLC may be served with process through its registered agent: Kyoung Lee, 17817 Davenport Rd. #115,

Dallas, Texas 75252. Plaintiff believes he received a 1099 one year from this entity, although he had never otherwise heard of it.

7. Defendants each have engaged in commerce or the production of goods for commerce at all material times, including in 2015, 2016, and 2017. Defendants continue at this time to engage in commerce or the production of goods for commerce.

8. Defendants had annual revenues in excess of $500,000 at all material times, and have had annual revenues in excess of $500,000 in 2015, 2016, and 2017.

9. Defendants have, at all material times, acted, directly or indirectly, in the interest of an employer with respect to Plaintiff and the Class Members.

10. Defendants have, at all material times, been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

11. Defendants have, at all materials times, each been an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

12. Defendants have, at all material times, been an enterprises engaged in commerce or in the production of goods for commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that Defendants have had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and Defendants have had and continue to have annual gross volume of sales made or business done in excess of $500,000, exclusive of excise taxes at the retail level which are separately stated.

13. The Court has personal jurisdiction over Defendants based on general and specific jurisdiction. For years, Defendants have done business in the state of Texas, and they continue to do business in the state of Texas.

14. The Court has subject matter jurisdiction over this case based on federal question jurisdiction and diversity jurisdiction. There is federal question jurisdiction because Plaintiff and the putative Class Members all base their claims in this case on the FLSA, a federal law.

**FACTUAL BACKGROUND IN LIGHT OF THE ECONOMIC REALITIES TEST FOR EMPLOYEE STATUS**

15. Global is in the business of residential and commercial garage door repair, replacement, and service. Global is located in many different states and cities (Dallas News Article of 10/2015, Ex. 1). Global employs "Technicians" to repair, replace, and service the garage doors.

16. Global advertises for new Technicians on Craig's List, stating, "no experience necessary." (Dallas Morning News Article of 10/2015, Ex. 1). Plaintiff saw the ad on Craig's List. He called the number provided and was asked basic questions, such as if he was over 18 years old and had a driver's license. After that short interview, Plaintiff went to Global's warehouse in Houston, Texas and interviewed with the Houston and San Antonio City Manager at the time, Bobby Kennard. Kennard hired him after a short discussion. When Plaintiff was hired he had no experience repairing, replacing, or servicing garage doors. Plaintiff was hired effective December 1, 2013.

17. Plaintiff was sent to San Antonio for three weeks of training on how to service garage doors. He was given the training by Bobby Kennard and some other Technicians. Other newly hired Technicians and Class Members also received similar training. While Plaintiff was in San Antonio for the training, he stayed in a hotel that was paid for directly by Global. Global also paid Plaintiff $500 a week while he was in training, and paid for his gasoline to get from his home in the Houston area at the time, to San Antonio.

18. When he was hired, Plaintiff was required to sign a "Subcontractor Agreement" with an entity called America's Alliance d/b/a America's Choice Garage Door Service

(Subcontractor Agreement, Ex. 3). The Class Members signed the same, or similar "agreement." The "agreement" provided that Plaintiff was an "independent contractor," but also included post-relationship customer non-solicitation and non-competition provisions (Subcontractor Agreement, Ex. 3 at ¶¶ 6.3, 6.4, 10.7).

19. Global sends out direct marketing materials, and does other advertising. When a potential customer calls, their call is routed to Global's Call Center in Carrollton, Texas. The Call center's dispatch department then contacts Plaintiff and the Class Members and sends them the information they need to go to the customers and provide them the relevant garage door repair, replacement, or service. Plaintiff and Class Members were given flyers by Global reflecting what to charge customers. (Ex 4). If it turned out that the customer's repair or service would cost less than $200.00, Plaintiff and Members of the Class had to call a special department within Global and have the customer talk to Global about the service or repair, with the goal of getting the customer to pay at least $200.00.

20. Global fronted the Plaintiff and the Class Members the inventory they needed. (Ex. 5). Plaintiff provided his own tools (an impact drill, winding bars, hammer, screw driver, vice grips, socket, and hacksaw), at a cost of between $250.00 and $400.00. The Dispatch department sent Plaintiff and the Class Members on so many calls each day that it was obvious they were regularly working more than 40 hours per work week. This was in line with Global's promise in their Craig's List ads to give Technicians "more work than YOU can handle."

21. The Technicians were paid on commission (a percentage of what the customer paid). If there was a complaint, and a Technician had to go out on a warranty call, they were paid a flat amount (often $10.00) to cover that call.

22. If Plaintiff or a Member of the Class happened upon someone (say, for example, neighbor of a customer) who needed garage door service, they were required to route them to Global's Call Center – they did not have the right to simply directly provide the services or repairs they needed. Plaintiff and Class Members were told by Jason Romo, a Manager with Global, that if they did that, it would be considered "stealing" from the Company.

23. Global mandated weekly meetings of the Technicians in Houston, Texas typically led by the City Manager. The meetings were held at the Global warehouse in Houston, Texas. Technicians in other cities had similar meetings.

24. Plaintiff resigned from Global on September 13, 2015. Between his date of hire, December 1, 2015, and his date of resignation, September 13, 2015, Plaintiff did not work anywhere else. He was unable to work anywhere else even if he wanted to, because he was working 60 to 70 hours per week on average.

25. Over the past three years, Global has had more than 300 Technicians perform work repairing, replacing, or servicing garage doors for its customers in the United States. Global sent all of them 1099s to reflect the compensation that they were paid by Global during 2014, 2015, and 2016. Global intends to send them all 1099s to reflect the compensation that they were, or will be, paid by Global during 2017.

26. The Technicians regularly work far more than 40 hours in a work week. Global knows that. However, Global classifies all the Technicians as "independent contractors," and thus does not pay them overtime under the FLSA, 29 U.S.C. § 201 *et seq*. Global's classification of the Technicians is wrong; they are employees under the FLSA, not independent contractors. As observed by the Fifth Circuit, the FLSA definitions of "employee" and "employer" are broad and intended to encompass "some parties who might not qualify as such under a strict application of

traditional agency law principles." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, (1992)).  And although Plaintiff and the other Members of the Class were employed pursuant to an "Subcontractor Agreement" explicitly designating them all as independent contractors rather than as employees (Subcontractor Agreement, Ex. 3 at ¶ 10.7), the Agreement's terms are not determinative. *See Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1315 (5th Cir. 1976) ("[n]either contractual recitations nor subjective intent" can mandate a finding of employee or independent contract status.).

27. Instead, in order to determine whether an individual is an employee or an independent contractor, the relevant inquiry is "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343. In making that determination, the Court should consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Hopkins*, 545 F.3d at 343.  No factor is sufficient or dispositive in and of itself; instead each should be considered in the larger context of the ultimate inquiry. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–44 (5th Cir. 1987).  "The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented." *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010).  In this case, the facts demonstrate that Plaintiff and the Members of the Class are employees, not independent contractors.

28. **<u>Degree of Control Exercised by Defendants</u>**. In determining the degree of control exercised by the purported employer, the court should look to whether an individual exerts such

control over a meaningful part of the business that he stands as a separate economic entity, or whether the alleged employer still controls the meaningful economic aspects of the business. *See Hopkins*, 545 F.3d at 343. The autonomy of the individual must be meaningful, as "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id*. (quoting *Mr. W. Fireworks*, 814 F.2d at 1049). Here, Global controlled the meaningful economic aspects of the business:

> a. Plaintiff and Class Members did not go find their own installation, repair, or service jobs each day. Rather, Global's Dispatch department contacted the Plaintiff and the Class Members with the installation, repair, or service jobs they were to run and handle each day, and they ran them as instructed. Global made a point of that in recruiting Technicians, telling them, "[w]e will provide you with customers." (Dallas Morning News Article of 10/2015, Ex. 1).
>
> b. If it turned out that the customer's repair or service would cost less than $200.00, Plaintiff and Members of the Class did not have the option to simply do the work. Rather, they had to call a special department within Global and have the customer talk to that department within Global about the service or repair, with the goal of getting the customer to pay at least $200.00.
>
> c. Plaintiff and the Members of the Class did not have the option to refuse the installation, repair, or service jobs they were given by Global's Dispatch department. In fact, Global's written national policy was to reduce the commissions otherwise paid to the Plaintiff and the Members of the Class, suspend them, or fire them, if they refused a call, did not complete the call as scheduled, or did not answer Dispatch's calls (Ex. 6). *Compare Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (finding independent contractor status where drivers could reject deliveries "**without retaliation**") (emphasis added). Plaintiff's commissions were threatened to be reduced pursuant to this policy (E-mail from Willard of May 2, 2015, Ex. 7).
>
> d. Plaintiff and the Class Members were contractually required by the terms of the Subcontractor Agreement to confirm their services to Global's satisfaction, and if Global was not satisfied with their services, Plaintiff and the Members of the Class were obligated to "promptly perform, repair, replace or re perform such element at no cost to [Global] in a manner that does conform [to their satisfaction]." (Subcontractor Agreement, Ex. 3 at ¶¶ 2.1, 2.2).
>
> e. Plaintiff and Class Members were bound by customer non-solicitation and non-competition provisions set forth in the Subcontractor Agreement (Subcontractor Agreement, Ex. 3 at ¶¶ 6.3 and 6.4). Those provisions: (i) barred Plaintiff and the

> Class Members from soliciting customers or even prospective customers to do business with anyone other than Defendants while Plaintiff and Class Members worked for the Defendants, and for twelve months thereafter; and (ii) barred Plaintiff and the Members of the Class from working as garage door servicemen for themselves, or on behalf of any other company, while they worked for Defendants, and for twelve months thereafter (*Id*. at ¶¶ 6.3 and 6.4).
>
> f. Plaintiff and Class Members were required to wear Defendants' company uniforms. (Ex. 8).
>
> g. Plaintiff and Class members were required to introduce themselves as employees of Defendants' "local name." (Ex. 9).
>
> h. Defendants supervised Plaintiff's and Class Members' driving during company work time through their "driver and vehicle safety program." (Ex. 10).

29. This evidence indicates that the factor concerning the degree of control exercised by the purported employer favors a finding of employee status in this case.

30. **<u>Extent of the Relative Investments of the Technicians and the Defendants</u>**. In applying the relative-investment factor, courts compare each worker's individual investment to that of the alleged employer. *See Hopkins*, 545 F.3d at 344. While the Plaintiff and the Class Members used their own vehicles to drive to the customers' locations, that is of little import, because they were their own personal vehicles, not vehicles they had to purchase specifically to be a Technician for Defendants. *See Herman*, 161 F.3d at 304 ("Although the driver's investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes."). Similarly, while the Plaintiff and the Class Members used their own tools, they were mostly common tools that most Members of the Class probably already had before they entered any relationship with Defendants. *See Mr. W Fireworks*, 814 F.2d at 1051 ("One operator testified that he used a computer to assist him while working at the stand, but this involved no investment because he originally had purchased the home computer for school work."). Even if they did not have the tools already, they only cost a

total of $250.00 to $400.00 or so to purchase them, which is far less than Global's relative investment. *See infra*.

31. Global invested significantly in Plaintiff and Class Members. For example, Plaintiff was sent for three weeks of training in San Antonio after he was hired, and was paid $500.00 per week, plus his hotel was paid for by Global, and Global covered his gasoline costs to get to the training in San Antonio. That alone exceeds Plaintiff's investment. The Class Members were treated in the same, or similar way, in this regard. *See Thibault*, 612 F.3d at 847 (finding that the plaintiffs were independent contractors when the alleged employer did **not** train them to do their jobs and they simply learned by "on the job").

32. In addition, Global advanced all inventory to the Plaintiff and Class Members. This investment was so significant that Global itself issued a memorandum to the Technicians stating that they needed each Technician to build up to a $1,200.00 deposit through withholdings in order to "protect its financial investment in [Plaintiff and the other Technicians]." (Technician Inventory Form, Ex. 5).

33. Global contractually agreed to reimburse the Technicians for approved expenses (Subcontractor Agreement, Ex. 3 at ¶ 3.2). In addition, Global's investment — including maintaining corporate offices in Carrollton, Texas, providing the Call Center, dispatching services, and developing and marketing its garage door installation, repair, and service offerings — outweighs the personal investment of any one Technician. As such, Global's greater overall investment in the business scheme clearly indicates that the relative-investment factor weighs in favor of employee status. *See Hopkins*, 545 F.3d at 344 (finding this factor weighed in favor of employee status based on same analysis).

34. **The Degree to Which the Worker's Opportunity for Profit or Loss Is Determined by Defendants**. In *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013), the court framed the opportunity for profit or loss factor as one "consider[ing] the alleged employee's opportunity for profit or loss depending upon his managerial skill." *Id*. at 1317. The court stated that "[a]n individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business." *Id*. Here, Plaintiff and the Class Members were entirely dependent on Global to send them on installation, repair, or service jobs in order to make commissions. Thus, it was only through Global that Plaintiff and the Class Members obtained any profit.

35. Further, as noted above, Plaintiff and the Class Members were contractually barred from soliciting customers or even prospective customers to do business with themselves directly, or for some other entity they worked for (Subcontractor Agreement, Ex. 3 at ¶¶ 6.3 and 6.4). As such, the Plaintiffs and the Class Members were, for all intents and purposes, entirely dependent on Global's Dispatch department to send them on installation, repair, or service jobs to make money. They had no other way to make a profit. As such, Global determined the Plaintiff and the Class Members' opportunity for profit and loss, and this factor militates towards employment status, rather than independent contractor status. *Hopkins*, 545 F.3d at 346 (plaintiffs were employees when they were not allowed to work for other companies or themselves).

36. Finally, as to this point, the Plaintiff and the Class Members regularly worked 60 to 70 hours per week, or more. As such, as a practical matter, they could not even work a side job in an unrelated industry to earn extra money. Consequently, this factor too favors a finding of employee status, rather than independent contractor status. *See Cromwell v. Driftwood Elec.*

*Contractors, Inc.*, 348 Fed. Appx. 57, 61 (5th Cir. 2009) (factor related to opportunity for profit or loss weighed in favor of employment status where employees' required schedule "had the effect of severely limiting any opportunity for profit or loss" by "preclud[ing] significant extra work.")

37. **The Skill and Initiative Required in Performing the Job**. This factor considers whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status. *See Pilgrim Equip.*, 527 F.2d at 1314 ("Routine work which requires industry and efficiency is not indicative of independence and nonemployee status."). Generally, courts in this circuit look for some unique skill set, *see Carrell*, 998 F.2d at 333 (noting that "[p]ipe welding, unlike other types of welding, requires specialized skills"), or some ability to exercise significant initiative within the business, *see Hickey v. Arkla Industries, Inc.,* 699 F.2d 748, 752 (5th Cir. 1983) (noting that the plaintiff-salesman controlled "major components" of the business open to initiative, including advertising, marketing, and the choice of other products to sell). Being a Technician who installs, repairs, and services garage doors require little training, and no special training or unique skill set. Global itself advertises that there is "no experience necessary." (Dallas Morning News Article of 10/2015, Ex. 1). As such, this factor too favors a finding of employee status, over independent contractor status. *See, e.g.*, *Hopkins*, 545 F.3d at 344 (finding same factor favor employee status as to Sales Leaders).

38. **The Permanency of the Relationship**. In *Herman*, the Fifth Circuit found that the permanency factor pointed toward independent contractor status when "[t]he majority of drivers work for Express for a short period of time. Drivers are able to work for other courier delivery companies, and the 'Independent Contractor Agreement' does not contain a covenant-not-to-compete." 161 F.3d at 305.

39. The facts of this case are in stark contrast to *Herman*. Here, Plaintiff worked for Global almost two years – from December 1, 2013 to September 13, 2015. Like Plaintiff, many of the Technicians worked for Global for more than a year, and the Technicians are contractually barred from working for any other garage door installation, repair, or service company both during their working relationship with Global, and for twelve months thereafter (Subcontractor Agreement, Ex. 3 at ¶¶ 6.3 and 6.4). As such the facts of this case are the opposite of *Herman* as to this factor, and thus this factor militated towards employee status, rather than independent contractor status.

40. Moreover, the Technicians are not hired on a project by project, or job by job basis. Nor did they regularly work for a while for Global, then leave, and return to work for Global again. Rather, they were hired and worked on "evergreen" status like any other normal employee would work. This further supports a finding of employee, rather than independent contractor, status. *See Cromwell*, 348 Fed. Appx. at 61 (permanency factor weighed in favor of employment status where splicers "did not have [a] temporary, project-by-project, on-again-off-again relationship with their purported employers").

41. The bottom line is this: As a matter of economic reality, the Plaintiff and the Class Members were not in business for themselves. That is dispositive. They were employees, not independent contractors. *See Cromwell*, 348 Fed. Appx. at 61 (finding plaintiffs were employees, not independent contractors, as a matter of law, stating: "Although there are facts that clearly weigh in favor of independent contractor status, notably that Cromwell and Bankston controlled the details of how they performed their work, were not closely supervised, invested a relatively substantial amount in their trucks, equipment, and tools, and used a high level of skill in performing

their work, these facts are not sufficient to establish, as a matter of economic reality, that Cromwell and Bankston were in business for themselves during the relevant time period.) (Footnote omitted).

### FLSA CLAIMS FOR OVERTIME PAY FOR PLAINTIFF & A CLASS OF SIMILARLY SITUATED WORKERS

42. Under the FLSA, employers such as Defendants are generally required to pay hourly paid employees like Plaintiff time and one-half their regular rate for all hours worked over 40 in a workweek. *See* 29 U.S.C. § 207(a)(1). As the Fifth Circuit has stated: "The Fair Labor Standards Act generally requires that employees be paid an overtime premium of "time-and-one-half" for all hours worked in excess of forty hours in a week." *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 633 (5th Cir. 2001) (citing 29 U.S.C. § 207(a)).

43. There are some exceptions to this rule (for example, for "computer professionals" as defined by the FLSA and its interpretive regulations), but none of them applied to Plaintiff, or any of the similarly situated Technicians. Thus, for every hour Plaintiff and the Class Members worked over 40 in a workweek, Defendants were required by the FLSA to pay them an additional overtime premium. Defendants, however, failed to do that. Thus, Defendants violated the FLSA rights of Plaintiff and the Class Members, and owe them the overtime premium that Defendants should have paid pursuant to the FLSA, and that Plaintiff and the Class Members were entitled to receive pursuant to the law.

44. In addition, Defendants owe Plaintiff and the Class Members an equal amount in liquidated damages. This is so because, under the FLSA, an employer who violates the overtime provisions is liable not only for the unpaid overtime compensation, but also for "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). While an employer may try to avoid liquidated damages by showing its FLSA violation was in "good faith," that is an extremely difficult burden to satisfy. As the Fifth Circuit has put it, "[a]n employer 'faces a 'substantial

burden' of demonstrating good faith and a reasonable belief that its actions did not violate the FLSA.'" *Singer v. City of Waco*, 324 F.3d 813, 823 (5th Cir. 2003) (quoting *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir. 1998)).

45. For example, in *Bolick v. Mgmt. by Skylane, LLC*, the court considered whether the Defendants had produced sufficient evidence to support a § 260 good faith defense. Civ. A. No. H-07-2261, 2008 WL 4589961 (S.D. Tex. Oct.14, 2008) (Smith, J). The Defendant produced evidence that an executive was not aware of FLSA requirements, sought legal counsel when it created payroll policies, and "always clearly notified its exempt employees that they were paid a specified weekly wage for all hours worked in each workweek, regardless of the number of hours worked." *Id*. at *1. The executive also testified that the Defendants "has always endeavored to comply with the terms of all applicable state and federal laws, including the [FLSA]." *Id*. The court still found that the Defendant had failed to produce sufficient evidence to withstand summary judgment because there was "no evidence of any specific ongoing efforts by Defendant to comply with the FLSA." *Id*.

46. Defendants have no evidence remotely as strong as the employer in *Bolick* that its violation of the FLSA's basic "time and one-half" overtime rule was in "good faith." The fact is that the rule Defendants violated is so basic that it could not have been in "good faith." *See also Riddle v. Tex-Fin, Inc.*, Civil Action No. H–08–31212011, WL 1103033, at *4 (S.D. Tex. Mar. 22, 2011) (awarding liquidated damages in FLSA case even where the jury did not find the violation to be willful); *Tran v. Thai*, NO. CIV.A. H-08-3650, 2010 WL 5232944, at *6 (S.D. Tex. Dec. 16, 2010), (granting summary judgment for the plaintiff in an FLSA case on the question of "good faith," stating "though the Defendants conducted internet research once to determine whether a receptionist was covered by the FLSA and were unsure as to whether they had sufficient gross

revenue to be an employer under the FLSA, the Defendants have identified no evidence of any specific and ongoing efforts to comply with the FLSA. The plaintiffs are entitled to summary judgment on this defense.").

47. All conditions precedent, if any, to this suit, have been fulfilled.

48. At all material times, Plaintiff was an employee of Global's under the FLSA. 29 U.S.C. § 203(e).

49. At all material times, the Class Members were employees of Global's under the FLSA. 29 U.S.C. § 203(e).

50. At all material times, Defendants Global was and a covered employer under the FLSA. 29 U.S.C. § 203(d).

51. At all material times, Plaintiff and the Class Members routinely worked in excess of 40 hours per seven-day workweek, and Defendants had knowledge of that.

52. At all material times, Plaintiff and the Class Members were and are entitled to overtime compensation for hours worked over 40 in a seven-day workweek. 29 U.S.C. § 207(a)(1).

53. At all material times, Defendants failed to pay Plaintiff and the Class Members overtime compensation of one and one-half their regular hour rate of pay for hours worked over 40 in a seven-day workweek.

54. Defendants' violations of the FLSA were willful within the meaning of 29 U.S.C. § 255(a). *See Singer v. City of Waco*, 324 F.3d 813, 821-22 (5th Cir. 2003) (upholding a jury finding of willfulness).

55. Defendants did not and have not made a good faith effort to comply with the requirements of 29 U.S.C. § 260.

56. Where, as here, "the employers' actions or policies were effectuated on a companywide basis, notice may be sent to all similarly situated persons on a companywide basis." *Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 825 (N.D. Tex. 2007).

57. Accordingly, Plaintiff seeks to represent a class under 29 U.S.C. § 216(b) on behalf of:

> **All current and former Technicians classified as independent contractors who performed work for Defendants at any time during the three-year period preceding the date the Court certifies this case as a Section 216(b) collective action to the present.**

## JURY DEMAND

58. Plaintiff demands a jury trial.

## DAMAGES AND PRAYER

Plaintiff asks that the Court issue citation for Defendants to appear and answer, and that Plaintiff and the Class Members be awarded a judgment against Defendants for the following:

    a. Actual damages in the amount of unpaid overtime wages;

    b. Liquidated damages under the FLSA;

    c. Prejudgment and post-judgment interest;

    d. Court costs;

    e. Reasonable attorneys' fees and costs; and

    f. All other relief to which they are justly entitled in equity or under the law.

Respectfully submitted,

SHELLIST | LAZARZ | SLOBIN LLP


By: */s/ Todd Slobin*
TODD SLOBIN
Texas Bar No. 24002953
tslobin@eeoc.net
RICARDO J. PRIETO
Texas Bar No. 24062947
rprieto@eeoc.net
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
Telephone: (713) 621-2277
Facsimile: (713) 621-0993

ATTORNEYS FOR PLAINTIFF &
CLASS MEMBERS